UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
THE HUMANE SOCIETY OF                                    :
THE UNITED STATES,                                       :
                                                         :
                               Plaintiff,                :
                                                         :          06 CV 6829 (HB)
              - against -                                :
                                                         :          AMENDED
                                                         :          OPINION &
HVFG, LLC.                                               :          ORDER
                                                         :
                               Defendant.                :
-------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Plaintiff The Humane Society of the United States, ("Plaintiff" or "HSUS") brings this suit against Defendant HVFG, L.L.C. ("Defendant" or "HVFG") for violations of the Clean Water Act. *See* 33 U.S.C. § 1365 (2010). HSUS contends that HVFG violated two state-issued Clean Water Act permits, because HVFG discharged pollutants in excess of permitted levels and failed to follow the permits' reporting and monitoring requirements. HVFG claims that it is not liable for any Clean Water Act violations because certain alleged violations are not actionable under the statute, all other violations were resolved in an Order on Consent with the state environmental agency, and that it has otherwise demonstrated that HVFG did not violate the permit requirements. The parties cross-moved for summary judgment. This Court finds that there are sufficient undisputed material facts to show that HVFG committed a number of Clean Water Act violations, but that only some of them are actionable. For the reasons that follow, Plaintiff's motion for summary judgment is DENIED in part and Defendant's motion is GRANTED to the extent that certain alleged violations have been mooted by subsequent state action, as is spelled out below. Plaintiff's motion for summary judgment is otherwise GRANTED. Defendant's motion is DENIED with regard to the reporting and monitoring violations that were not resolved by the state action.[1] In light of the prior remedial actions by HVFG, I find the most appropriate remedy here is a nine-month affirmative injunction to ensure HVFG's proper compliance with, and understanding of, its monitoring and reporting

---

[1] Defendant's motion for summary judgment did not raise any additional issues

requirements pursuant to the Clean Water Act permits, as well the establishment of an environmental benefit project.

## I.    BACKGROUND[2]

### A.  Statutory Background

The Clean Water Act ("CWA" or "Act") was established "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251.  It seeks to eliminate the discharge of pollutants into navigable waters, and has an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." *Id.*  To carry out these goals, the CWA created the National Pollutant Discharge Elimination System ("NPDES"), which provides the Environmental Protection Agency ("EPA") with the authority to issue permits that regulate the discharge of pollutants according to certain specified conditions.  *See* 33 U.S.C. § 1342; *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52-53 (1987).  The statute also allows a state to take control of this permit system and administer the NPDES itself, so long as it conforms to federal guidelines and is approved by the EPA Administrator.  *Id.*  New York State has established its own permit system, referred to as the State Pollutant Discharge Elimination System ("SPDES," pronounced "spee-dees"), which is operated by the New York State Department of Environmental Conservation ("DEC").  *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 486 (2d Cir. 2001); N.Y. Envtl. Conserv. Law §§ 17-0105(13); 17-0701; 17-0803.  "Generally speaking, the NPDES [and SPDES] requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters."  *South Florida Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004).

The CWA "formally prohibits the discharge of a pollutant by any person[3] from any point source to navigable waters except when authorized by a permit issued under the National Pollutant Discharge Elimination System."  *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486, 491

---

[2] The background is drawn from undisputed facts submitted by the parties, and any material disputes are noted. Plaintiff moved to strike certain materials filed by Defendant in opposition to Plaintiff's summary judgment motion and in support of its own motion, because the submissions were untimely and otherwise inadmissible pursuant to Rule 56(e) of the Federal Rules of Civil Procedure.  Rather than address these arguments in detail, I have concluded that even without reference thereto, Defendant is liable for certain reporting and monitoring violations.  *See infra.*
[3] The term "person" means "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."  33 U.S.C. § 1362(5).

(2d Cir. 2005); *see also* 33 U.S.C. §§ 1311, 1342.  A "point source" is "any discernible, confined and discrete conveyance … from which pollutants are or may be discharged," which includes concentrated animal feeding operations or "CAFOs."  33 U.S.C. § 1362(14).  "CAFOs are the largest of the nation's 238,000 or so animal feeding operations – agriculture enterprises where animals are kept and raised in confinement."  *Waterkeeper Alliance*, 399 F.3d at 492 (internal quotations omitted).  NPDES permit requirements for CAFOs "apply with respect to all animals in confinement at the operation and all manure, litter, and process wastewater generated by those animals or the production of those animals."  40 C.F.R. § 122.23(a).  Any CAFO that "discharges or proposes to discharge" must seek coverage pursuant to a permit.  § 122.23(d)(1).

The Act provides essentially two methods of enforcement for this regulatory structure. The EPA or a state agency like the New York DEC may enforce permit requirements through administrative, civil, and criminal sanctions.  *See* 33 U.S.C. § 1319.  In addition, "[i]n the absence of federal or state enforcement, private citizens may commence civil actions against any person alleged to be in violation of the conditions of either a federal or state NPDES permit." *Gwaltney*, 484 U.S. at 53 (internal quotations omitted); *see also* 33 U.S.C. § 1365(a).  Prior to bringing suit, a citizen must first give 60 days' notice "(i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order."  § 1365(b).  In a successful "citizen suit," a district court may order civil penalties and equitable relief; the citizen who brings suit may also be entitled to expenses and attorney's fees. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 175 (2000); 33 U.S.C. § 1365(a), (d).

### B.  Factual Background

HSUS is a non-profit membership organization with over 846,000 members and constituents in New York State and over 11 million members and constituents total.  It is a self-described "animal protection organization," whose goals include "protecting the nation's wildlife and wildlands and fostering the humane treatment of all animals."  *See* The Humane Society of the United States, About Us: Overview, http://www.humanesociety.org/about/overview/ (last visited Apr. 18, 2010); Decl. of Dr. John W. Gandy, ¶¶ 1-2.  HVFG operates Hudson Valley Foie

Gras, a CAFO that raises and slaughters ducks for the production of foie gras.[4]  HVFG operates two facilities near Ferndale, New York, which include duck-raising facilities, manure storage tanks and pits, and a slaughterhouse facility.[5]  The facilities are permitted to confine up to 100,000 ducks, and contained approximately 41,000 ducks as of March 13, 2009.  As is perhaps obvious, HVFG's operations create a sizeable quantity of waste and by-products.  Annually, HVFG generates more than 5,000 tons of manure, 600 tons of litter and bedding, and 5 million gallons of wastewater.  The facilities are located near or bordered by the Middle Mongaup River, a perennial stream that flows into the Mongaup River.  Wastewater from the slaughterhouse operation is treated and discharged into the Middle Mongaup River through a streambank pipe.

The New York DEC issued two SPDES permits to HVFG that are relevant to this action.  SPDES Permit No. NY 023-5393 regulates the discharge of pollutants from HVFG's duck slaughtering operation.  *See* Decl. of Sarah L. Conant in Supp. of Pl's Mot. for Summ. Judgment ("Conant Decl."), Ex B (SPDES Permit No. NY-023-5393) (hereafter "Slaughterhouse SPDES Permit").  The Slaughterhouse SPDES Permit places numerical restrictions on the discharge of certain designated parameters[6] that can act as harmful water pollutants, such as temperature, ammonia, settleable solids, phosphorous, chlorine, and fecal coliform.[7]  In addition, the permit requires certain monitoring activities, reporting requirements, and recordkeeping conditions.  The DEC also issued SPDES General Permit No. GP-04-02, which more generally regulates HVFG's CAFO operations at its two facilities.  Conant Decl., Ex. K (SPDES General Permit for CAFOs No. GP-04-02) (hereafter "CAFO SPDES Permit").  The CAFO SPDES Permit prohibits

---

[4] "Foie gras is the fattened liver of a waterfowl…produced by a special feeding process."  Hudson Valley Foie Gras, About HVFG: What is Foie Gras?, http://www.hudsonvalleyfoiegras.com/abouthvfg.html (last visited Apr. 18, 2010).  French law defines foie gras as fattened liver produced by *gavage*, or force-feeding of the waterfowl.  *See* French Rural Code, Article L654-27-1,
http://www.legifrance.gouv.fr/affichCodeArticle.do?cidTexte=LEGITEXT000006071367&idArticle=LEGIARTI000006584967&dateTexte=20100419 (last visited Apr. 18, 2010).  However, it may be produced by other methods as well.
[5] A third facility operated by HVFG was shut down by October 30, 2007.
[6] A "parameter" is a particular attribute of a discharge, such as the specific pollutants, discharge characteristics, or water quality indicators, such as color or pH value of the discharge.  *See Pub. Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1242 (3d Cir. 1995).
[7] Each of these items qualify as a pollutant under the Clean Water Act.  *See* 33 U.S.C. 1362(6).  Discharge of wastewater with a temperature above permitted levels can have an adverse impact on certain cold water aquatic species, enhance chlorine and ammonia toxicity, and increase algae growth rates.  Ammonia can be toxic to fish and stimulates algae growth.  Phosphorous similarly stimulates algae, and chlorine is likewise toxic to aquatic organisms.  Fecal coliform is an organism that indicates the potential presence of pathogenic bacteria and viruses, and higher than permitted levels poses a threat to human health.  *See* Decl. of Bruce A. Bell, Ph.D., P.E., BCEE in Supp. of Pl's Mot. ("Bell Decl.") ¶ 7.

any discharge of wastewaters into the surface waters of the State.[8]  It likewise contains detailed reporting, monitoring, and recordkeeping requirements, and in particular calls for the creation of a "Comprehensive Nutrient Management Plan" or "CNMP" to ensure practices in compliance with the permit.

After it provided a 60-day notice of intent, on September 6, 2006, HSUS filed a complaint against HVFG for violations of its Slaughterhouse SPDES Permit.  On December 21, 2006, HSUS sent a second 60-day notice to HVFG, this time with regard to violations of its CAFO SPDES Permit.  On February 15, 2007, HVFG entered into an Order on Consent with the DEC.  *See* Conant Decl., Ex. Q (DEC Order on Consent) (hereafter "DEC Order" or "Order").  The DEC Order purported to cover violations of both the Slaughterhouse and CAFO SPDES Permits.  It laid out a timetable and directions for HVFG to come into compliance with the permits, required the payment of a $50,000 civil penalty,[9] and required that they fund the purchase of an "Environmental Benefits Project" or clean up litter surrounding the Mongaup River.  The DEC Order also stated that the DEC conducted an inspection of HVFG facilities on June 20, 2006, and from that date to the date of the Order, "the Department is not aware of any discrepancies from proper operating procedures."  DEC Order ¶ 13.  On March 6, 2007, HSUS filed an amended complaint, which incorporated alleged violations of both the Slaughterhouse and CAFO SPDES Permits.  Defendant moved for early summary judgment on May 7, 2007, which was denied.  *See* Order, Aug. 11, 2009 (Docket No. 50).

Plaintiff now moves for summary judgment on its claims.  HSUS argues that there is no material factual dispute that HVFG violated both its Slaughterhouse and CAFO SPDES Permits.  Plaintiff claims that Defendant violated its Slaughterhouse SPDES Permit through (1) discharges in excess of the permitted levels for temperature, chlorine, settleable solids, phosphorous, ammonia, and fecal coliform; (2) improper calibration and use of temperature, chlorine, and settleable solid testing equipment; (3) failure to take discharge reporting samples at proper locations; (4) failure to properly record the time, location, and chain of custody for discharge reporting samples; (5) failure to correctly report temperature on certain dates; and (6) failure to show a basis for certain chlorine sample reports.  Plaintiff claims the Defendant violated its CAFO SPDES Permit through (1) impermissible discharges of pollutants in 2005 and 2006; (2)

---

[8] The permit provides an exception to this prohibition when there is a "25-year, 24-hour Storm Event."  The exception is not relevant in this action.
[9] $20,000 of the penalty was suspended and would only need to be paid if HVFG violated the DEC Order.

failure to properly complete and maintain a Comprehensive Nutrient Management Plan; and (3) improper storage of waste in a lagoon and storage tanks not constructed or certified by an engineering professional.[10]  HVFG opposes HSUS's motion and cross-moved for summary judgment, on the grounds that there is no liability for violations of either permit because (1) the DEC Order precluded or mooted all of Plaintiff's claims; (2) the alleged reporting and recordkeeping violations and any alleged violations of the CAFO SPDES Permit are not actionable Clean Water Act violations; and (3) to the extent they are actionable violations, undisputed material facts demonstrate that they did not violate these requirements.  Oral argument on these motions was held on March 23, 2010.  The following week at a conference in chambers, this Court discussed and advised both parties of its tentative findings as well as certain proposed remedies.  Finally, the parties each submitted letter briefs that addressed the Court's suggested relief of an injunction and equitable environmental remedial measures.

## II.   DISCUSSION

### A.  Legal Standard

Summary judgment is warranted if the moving party shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Cordiano v. Metacon Gun Club, Inc.* 575 F.3d 199, 204 (2d Cir. 2009); *see also* Fed.R.Civ.P. 56(c).  A material fact is one that will affect the outcome of the suit, and a dispute about a material fact occurs where there is sufficient evidence for a reasonable fact finder to return a verdict for the nonmoving party.  *See, e.g., Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  Evidence must be viewed in a light most favorable to the non-moving party, and all inferences must be drawn in their favor.  *See Cordiano*, 575 F.3d at 204.  A party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but…must set forth specific facts showing that there is a genuine issue for trial."  *Sista*, 445 F.3d at 169; Fed.R.Civ.P. 56(e).

### B.  Standing

#### 1.  *Constitutional/Associational Standing*

---

[10] In a letter dated March 17, 2010, Plaintiff withdrew its request for a finding of liability with regard to pre- January 1, 2007 violations of CAFO SPDES permit except for those related to the CNMP, and also with regard to failure to notify and report the 2005 and 2006 discharges.

Plaintiff must satisfy the case-or-controversy requirement of the Constitution to have standing to bring a lawsuit. *See* U.S. CONST. art. III, § 2. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 180-81 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). For an association to have standing, it must show that (1) its members would otherwise individually have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief requires participation of individual members. *See id.; Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006).

HSUS has provided more than sufficient facts to demonstrate that it has constitutional standing to bring this suit. *See Laidlaw*, 528 U.S. at 183; *see also Downtown Dev.*, 448 F.3d at 146. Defendant suggests that this suit is not sufficiently germane to HSUS's organizational purpose. While it is certainly true that HSUS is, in its own words, an "animal protection organization," this does not mean it cannot bring a Clean Water Act suit. The Second Circuit determined in *Downtown Development* that "germaneness" is a fairly modest test, and need only show that it would "reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." 448 F.3d at 149. Plaintiff here passes that test.

### 2. *Statutory Standing*

HSUS must also satisfy a number of statutory requirements under the Clean Water Act in order to properly bring suit against HVFG. A party may bring a citizen suit under the CWA when it (1) provides 60 days' notice to the alleged violator, the EPA, and the state; (2) has alleged a continuing violation of the Act; and (3) has not been precluded by EPA or state action. *See Laidlaw*, 528 U.S. at 174-75; 33 U.S.C. §§ 1365, 1319. HVFG essentially claims that HSUS has failed to satisfy any of these elements. To the contrary, HSUS has shown more than enough evidence to demonstrate that it meets these requirements.

The CWA states that no citizen suit may commence "prior to sixty days after the plaintiff has given notice of the alleged violation." 33 U.S.C. § 1365(b)(1)(A). The purpose of the notice provision is to give a violator the opportunity to come into compliance, and/or for the state or EPA to bring its own enforcement action, and thus render the citizen suit unnecessary. *See Gwaltney*, 484 U.S. at 60; *Trout Unlimited*, 274 F.3d at 488. According to the Second Circuit, the notice must list "each separate pollutant that will be alleged in a subsequent complaint as the basis of a violation of the Act." *Trout Unlimited*, 273 F.3d at 487 (adopting rule from *Pub. Interest Research Group v. Hercules*, 50 F.3d 1239, 1248 (3d Cir. 1995)); *see also* 40 C.F.R. § 135.3(a) (stating that the notice "shall include sufficient information to permit the recipient to identify" the components of an alleged violation). In this case, HSUS provided appropriate and sufficient notice prior to filing suit. Both notice letters were submitted to the proper parties, and both detail each of the pollutants alleged to be the basis of the violations.[11] "Once the discharge violation is noticed, any subsequently discovered monitoring, reporting or recordkeeping violation that is directly related to the discharge violation may be included in the citizen suit." *Hercules*, 50 F.3d at 1248. HVFG was given sufficient notice of the violations of both permits to investigate the merits of the claims, determine the scope of the problem, and come into compliance.

As noted, a citizen suit cannot proceed if it has been precluded by an EPA or state enforcement action. The CWA bars a citizen from filing suit where "the [EPA] Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State." 33 U.S.C. § 1365(b)(1)(B); *see Laidlaw*, 528 U.S. at 175. This bar does not apply here, however, because the DEC Order was a purely administrative action and did not involve any judicial proceeding.[12] *See Friends of the Earth v. Consol. Rail Corp.*, 768 F.2d 57, 63 (2d Cir. 1985); *City of Newburgh v. Sarna*, No. 09 Civ. 5117(CM), 2010 WL 572118, at *15 (S.D.N.Y. Feb. 5, 2010) (citing *Consol. Rail*). The Act also prohibits any action for an award of civil penalties where "the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed…" 33

---

[11] The first notice letter does not expressly mention settleable solids in the body of the letter. However, it notes that there are other pollutant discharges and incorporates an attached declaration, which lists settleable solids as one of the alleged pollutant violations.

[12] Even if it were applicable, HSUS provided notice and commenced its action for violations of the Slaughterhouse SPDES Permit before HVFG signed the DEC Order. Therefore, § 1365(b)(1)(B) would not preclude the violations that HVFG is ultimately liable for. *See, e.g., Laidlaw*, 528 U.S. at 175; *Atlantic States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991).

U.S.C. § 1319(g)(6)(A)(iii).  This section does not apply where a citizen has filed suit "prior to commencement of an action under this subsection" or where the citizen has given the required 60-day notice prior to the commencement of a state action and files suit within 120 days of the notice.  *See* § 1319(g)(6)(B).  Here, HSUS provided notice of the Slaughterhouse SPDES Permit violations on June 6, 2006 and filed suit on September 6, 2006, well before any agreement was reached between the DEC and HVFG.  As such, these claims cannot be barred by the later-produced DEC Order.  *See id.*  Plaintiff submitted a second notice letter for violations of the CAFO SPDES Permit on December 21, 2006, the DEC Order was signed on February 15, 2007, and the complaint was amended to include these further violations on March 6, 2007.  Since Plaintiff gave notice prior to the state action, and filed suit within 120 days, these violations are likewise not precluded by the statute.  *See id.*

Finally, HSUS must demonstrate a "continuing violation" in order to proceed with the lawsuit.  There is no statutory standing to sue "for violations that have ceased by the time the complaint is filed."  *Laidlaw*, 528 U.S. at 175.  According to Supreme Court precedent, "citizen-plaintiffs [must] allege a state of either continuous or intermittent violation-that is, a reasonable likelihood that a past polluter will continue to pollute in the future."  *Gwaltney*, 484 U.S. at 53.  Whether a continuing violation exists or not is determined at the time the complaint was filed.  *See Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co.*, 989 F.2d 1305, 1311 (2d Cir. 1993) (citing similar holdings from the 11th and 4th Circuits).  To survive summary judgment, Plaintiff must show "that defendant's violations continued subsequently to the date the complaint was filed, or present proof from which a trier of fact could find a continuing likelihood that violations would recur."  *Id.*  In this case, HSUS has provided ample evidence that permit violations by HVFG continued at the time the complaint was filed, and even when it was later amended to include further permit violations.  While the discharge violations in excess of permitted levels occurred prior to commencement, the reporting and monitoring-based violations of both permits continued after the suit was filed.  The fact that some, but not all, of these violations were ultimately resolved by a DEC Order months after the complaint was filed simply confirms that HSUS satisfactorily alleged continuing violations at the time the action was commenced.

**C.  HVFG Violated the Slaughterhouse and CAFO SPDES Permits**

Plaintiff has demonstrated sufficient undisputed material facts to prove that Defendant violated both its Slaughterhouse and CAFO SPDES Permits.  As the facts below demonstrate, HVFG discharged pollutants in excess of the designated levels in the Slaughterhouse SPDES Permit, and also failed to properly follow the permit's monitoring and reporting requirements. Similarly, HVFG twice discharged pollutants in violation of its CAFO SPDES Permit prohibition on discharge, failed to properly maintain and complete a CNMP as required by the permit, and did not properly design or certify certain waste storage systems.

1. *Slaughterhouse SPDES Permit*

Discharge Violations

HVFG's Slaughterhouse SPDES Permit contains two sections.  Part I details the "Permit Limits, Levels, and Monitoring Definitions."  Slaughterhouse SPDES Permit, Part I, at 2-10. The section provides a table which lists, *inter alia*, the parameter to be tested (e.g. total residual chlorine), the type and level of effluent limitations[13] on the parameter (e.g. a "daily maximum" temperature of 70 degrees), and the monitoring requirements for each parameter (e.g. a monthly "grab" sample at the effluent location).  *Id.*  The permit requires HVFG to submit to the DEC a monthly "Wastewater Facility Operation Report," more generally known as a "Discharge Monitoring Report" or "DMR," that contains the monitoring results for the pollutant parameters listed in the table.  *Id.* at 10.  The responsible corporate officer is required to sign each DMR and certify its accuracy.  *Id.*, Part II, § 10.2.  Evidence of a violation contained in a defendant's own DMR is sufficient to show liability on summary judgment.  *See Friends of the Earth v. Eastman Kodak Co.*, 834 F.2d 295, 298 (2d Cir. 1987).

Plaintiff shows, through DMRs submitted to the DEC, that HVFG exceeded the permitted parameter levels in the Slaughterhouse SPDES permit.  HVFG exceeded the temperature parameter, 70 degrees, from July 1, 2001 to August 1, 2005.  *See* Slaughterhouse SPDES Permit, Part I, at 5-6 (temperature parameter); Bell Decl., ¶ 12, Ex. D (list of dates and temperatures above parameter maximum taken from DMRs).  Putting aside arguments about mootness or lack of standing, Defendant's response is only that the majority of these violations occurred from June to October, and that they are not required to report temperature during those months.  This

---

[13] An effluent limitation is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance."  33 U.S.C. § 1362(11).

is simply incorrect.  The table for "Final Permit Limits, Levels and Monitoring" contains two pages, one for reporting parameters from June 1 to October 31, and one to report parameters from November 1 to May 31, and in both instances the permit requires that temperature not exceed 70 degrees.  *See* Slaughterhouse SPDES Permit, Part I, at 5-6.  As such, it  cannot be disputed that HVFG violated the temperature requirements of the Slaughterhouse SPDES Permit.

HSUS demonstrates that HVFG reported discharge samples in excess of other parameter limits as well.  Defendant reported (1) chlorine levels greater than the daily maximum, 0.1 mg/l, from July 1, 2001 to October 15, 2005; (2) settleable solids in excess of the parameter limit of 0.3 ml/l on November 8, 2001; (3) ammonia nitrogen samples in excess of the limit of 2.2 or 2.15 lbs/per day from February 1, 2002 to October 2004;[14] (4) phosphorous levels greater than the daily limit of 0.17 lbs/day and also failed to report levels from July 1, 2001 to May 31, 2006; and (5) fecal coliform levels greater than the maximum of  200 No./100 ml, from October 2001 to May 2005.  *See* Slaughterhouse SPDES Permit, Part I, at 5-6; Bell Decl., ¶¶ 17, 22, 26, 28, 30, and Ex. D.  Again setting aside standing and mootness arguments, HVFG provides no evidence which materially disputes Plaintiff's claims or would show that they in fact did not violate these parameter limits.[15]  Though Plaintiff faces further legal hurdles, some of which they do not clear, HSUS sufficiently demonstrates that HVFG discharged pollutants in excess of the parameter limits.

Reporting and Monitoring Violations[16]

The Slaughterhouse SPDES Permit also establishes a set of detailed requirements for the monitoring and reporting of pollutant discharge, and HSUS demonstrates that HVFG failed to properly follow some of these requirements as well.  First, Defendant failed to properly calibrate the thermometers used to measure temperature, as well as the "HACH colorimeter" used to

---

[14] Unlike the temperature parameter, the Slaughterhouse SPDES Permit slightly alters the limit for ammonia nitrogen between June to October and November to May.

[15] In some instances, HVFG disputes the specific number of violations as certain parameters were required to be sampled monthly instead of daily.  As such, they claim that HSUS unfairly exaggerated the number of violations by deeming a monthly report in excess of a permitted level to count as thirty or so separate violations, one for each day of that month.  While the specific number of violations is important for calculating civil penalties, it does not impact a finding of liability for permit violations.  Regardless of the number of times, Plaintiff has proved that Defendant exceeded certain parameter limits and therefore violated the express requirements of the permit.

[16] As with the claims of discharge violations, HSUS details the number of violations based on the days HVFG was not in compliance with the Slaughterhouse SPDES Permit's reporting and monitoring requirements.  As noted, *supra*, the number of violations is relevant to the degree of civil penalties that may be awarded, and are irrelevant to the question of whether or not HVFG violated elements of the permit in the first instance.  As such, I need not reference the specific number of "per day" violations that HSUS contend occurred.

measure chlorine.  A permit holder is required to "periodically calibrate and perform manufacturer's recommended maintenance procedures on all monitoring and analytical instrumentation to insure accuracy of measurement" and to keep a log of this maintenance. Slaughterhouse SPDES Permit, Part II, § 10.1(e).  According to HSUS' expert, the EPA requires that thermometers used to measure discharge samples be calibrated against a precision thermometer certified by the National Institute of Standards and Technology ("NIST").  *See* Bell Decl. ¶ 13.  Defendant initially admitted that it did not calibrate its thermometer or keep calibration records.  *See* Pl's Stmt. of Mat. Facts, ¶ 27; Def.'s Respon. to Requests for Admissions, ¶¶ 4-5.  Further, deposition testimony from two HVFG employees likewise indicates that the thermometer was not calibrated.  *See* Pl's Stmt. of Mat. Facts, ¶ 27; Ponce Dep. at 38:18-20 (Dec. 8, 2009); Caruso Dep. at 59:5-12.  Defendant submitted three declarations in conjunction with the summary judgment motions, which state that HVFG actually used a pre-calibrated NIST-certified thermometer that need not be regularly calibrated.  *See,* Henley Decl. ¶ 151; Jaeger Decl. ¶ 11; Morgan Decl. ¶10.  These late-filed declarations, submitted with no other evidentiary support, are insufficient to raise a material dispute in light of the prior admissions and deposition testimony of the HVFG employees who performed the measurements.  Indeed, one of the individuals now certain that HVFG used a pre-calibrated thermometer, *see* Jaeger Decl. ¶ 11, previously testified at his deposition that HVFG used "multiple thermometers," and that they were calibrated by "compar[ing] them to each other."  Jaegar Dep. at 159:22-160:13. "It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that…contradicts the affiant's previous deposition testimony." *Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999) (internal quotations omitted).

Plaintiff also provides sufficient evidence to show Defendant failed to properly calibrate the HACH colorimeter, an instrument used to measure chlorine levels.  According to HSUS, this instrument requires calibration with a standard chlorine solution.  *See* Bell Decl. ¶ 18 (citing manufacturer's instructions).  HVFG has no calibration records for the colorimeter, and HVFG's "wastewater operator" testified, contrary to the manufacturer instructions, that one need only "zero it out" with any water sample available.  Jaeger Dep. at 150:8-16.  That HVFG submitted additional declarations that simply assert the instrument "must" be calibrated in order for it to function, without any citation to the manufacturing instructions or some other evidence, simply

further highlights that Defendant is not itself perfectly clear as to how properly to calibrate its chlorine testing equipment.

Similar to the calibration requirement, the Slaughterhouse SPDES Permit also requires that "monitoring and analysis must be conducted using test procedures promulgated, pursuant to 40 CFR Part 136," federal regulations that describe the required testing methods for Clean Water Act discharge monitoring.  *See* Slaughterhouse SPDES Permit, Part II, § 10.4(a).  The measurement of settleable solids may be accomplished by the "Imhoff Cone" test.  *See* 40 C.F.R. § 136.3.  The evidence demonstrates that HVFG did not utilize the proper analytical method for the Imhoff Cone test.  Four different HVFG employees described what they believed to be the proper method for performing the test, each answer differed, and none included all the required elements of the testing method, such as the need to agitate the cone after letting the sample settle for 45 minutes.  *Compare, e.g.,* Jaegar Dep. at 176:2-23 (stating that he simply fills the cone with a one liter sample and waits an hour) *with* EPA Method 160.5 (requiring 45 minute wait, "gentle agitation" near sides of cone, and additional 15 minute wait before taking measurement).  The inability to describe or perform this test is even harder to comprehend given the fact that this Court found a straightforward explanation on the New York DEC website after just a few minutes of browsing.  *See* New York DEC, Plain English Guide for Testing and Reporting of Small Wastewater Systems, http://www.dec.ny.gov/chemical/8705.html (last visited Apr. 19, 2010) (describing EPA Method 160.5 for testing settleable solids).  While this sort of violation may seem minor, the fact that a regulated CAFO like HVFG could not comprehend the basic research necessary to ensure compliance with its permit and the Clean Water Act is at best, disturbing.

The Slaughterhouse SPDES Permit also requires that reporting samples be taken at the "effluent" location, the point where the discharge enters the river.  *See* Slaughterhouse SPDES Permit, Part I, at 4-6; Bell Decl. ¶ 10.  Plaintiff contends that Defendant failed to take samples for the measurement of temperature, chlorine, and settleable solids at the proper location, and cites testimony from a number of HVFG employees who described taking samples at a variety of locations other than at the streambank pipe where wastewater is discharged.  *See* Pl's Statement of Material Facts, ¶¶ 28, 34, 39.  HVFG's response is that they take additional "voluntary" samples at other locations "to monitor the entire process" and are for internal use only.  *See* Def.'s Stmt. of Material Facts in Opp. to Pl.'s Stmt. of Material Facts, ¶¶ 28, 34, 39.  This

response is incomplete and insufficient.  Other than the assertions of three individuals in declarations filed with the summary judgment motions, HVFG provides not a scintilla of evidence to back up its claim that only the samples taken at the effluent location were included in the reports submitted to the DEC, such as some record of sample data segregated by location. Further, if Defendant had actually read the permit carefully, it might have noticed that it also states: "If the permittee monitors any pollutant more frequently than required by the permit, using test procedures approved under 40 CFR Part 136 or as specified in this permit, *the results of this monitoring shall be included in the calculations and recording of the data on the Discharge Monitoring Reports.*"  Slaughterhouse SPDES Permit, Part I, at 10(e) (emphasis added).  In other words, Defendant has provided no sufficiently material fact that contradicts Plaintiff's evidence that water samples were taken at improper locations, and even highlights a potential further violation of the permit with regard to the need to report all sampling data.

Plaintiff next claims that Defendant failed to properly record the time, location, and chain of custody for samples taken to measure temperature, chlorine, settleable solids, phosphorous, ammonia, and fecal coliform.  The Slaughterhouse SPDES Permit requires that HVFG keep monitoring information records for at least three years, and must include "the date, exact place, and time of sampling or measurements … the individual(s) who performed the sampling or measurements … the date(s) analyses were performed … the individual(s) who performed the analyses … the analytical techniques or methods used; and … the results of such analyses."  Part II, § 10.3.  HVFG admitted in Plaintiff's Request for Admissions that it did not keep records of the time of day or chain of custody for its monitoring samples.  *See* Def's Resp. to Pl's Request for Admissions, ¶¶ 17-18, 25.  Defendant now claims that the time of day is "irrelevant," that they need not record a chain of custody because "samples are taken at the discharge point, and temperature levels are immediately recorded," and the location for testing is recorded in HVFG's "Standard Operating Procedures Manual."  *See* Def.'s Stmt. of Material Facts in Opp. to Pl's Statement of Material Facts, ¶¶ 29, 33, 38, 44, 47, 51.  However HVFG may feel about the relevance or need of certain recordkeeping in light of how they perform their tests, the permit clearly requires that they record the time of sampling, who performed the sampling and analysis, and where the sampling occurred.  As the complete absence of records in support of their arguments itself tends to indicate, HVFG did not properly keep records as required by its Slaughterhouse SPDES Permit.

14

Two more points raised by HSUS, while minor, are nonetheless straightforward violations of the Slaughterhouse SPDES Permit.  First, HVFG failed to correctly report certain temperature measurements in July 2007, as the temperature measurements on the handwritten form report kept by HVFG differed from the DMR submitted to the DEC.  *See* Bell Decl., Ex. K, L (Printed and Handwritten Wastewater Facility Operation Reports for July 2007).  HVFG's only response is that temperature measurements need not be reported in July.  *See* Def.'s Stmt. of Material Facts in Opp. to Pl.'s Stmt of Material Facts, ¶ 30.  As described, *supra*, this is simply an incorrect reading of the Slaughterhouse SPDES Permit, which requires year-round temperature measurement.  Second, HVFG reported chlorine levels in October 2007 despite a lack of any basis to report these numbers.  The HVFG wastewater operator testified that he took the handwritten measurements of discharge samples, re-typed the data, and submitted the typed DMR to the DEC.  Jaeger Dep. at 72:21-73:22.  The October 2007 handwritten DMR contains no data on chlorine levels, yet the typed DMR submitted to the DEC contained this information. Lacking a basis to report these findings, HVFG could not fairly certify the accuracy of the information it submitted to the DEC, in violation of its permit.  *See* Slaughterhouse SPDES Permit, Part I at 10 (all information recorded on DMR shall be based upon measurements or samples carried out by Permitee); Part II, § 10.2(c) (Permitee must certify accuracy of report). HVFG claims it sent the handwritten notes to certain consultants, who transferred it to another form, but provides no evidence to support this claim.  Notably, this violation also highlights why the chain of custody recordkeeping requirements mentioned in the previous paragraph are important: had HVFG maintained proper records, it might have been able to explain what happened to this missing data, or not lost it in the first instance.

### 2. *CAFO SPDES Permit*

Unlike the Slaughterhouse SPDES Permit, which permits the discharge of pollutants up to a certain level, the CAFO SPDES Permit flatly prohibits any other discharge.  *See* CAFO SPDES Permit, § VI.A-B ("There shall be no discharge of process wastewater pollutants to the surface waters of the State …").  Additionally, the permit requires that HVFG complete and maintain a Comprehensive Nutrient Management Plan (CNMP), which "shall describe and ensure the implementation of practices which are to be used to assure compliance with the limitations and conditions of this permit."  *Id.* § VII.A.  Finally, the permit sets forth a number of required "Best Management Practices," such as the need to amend waste-handling procedures

and structures before expanding operations, immediately report any discharge to the state, and keep records required by the permit for at least five years. *Id.* § VIII and IX.

HSUS alleges three categories of CAFO SPDES Permit violations by HVFG: (1) the prohibited discharge of pollutants; (2) the failure to properly maintain and amend a complete CNMP; and (3) the improper storage of waste products. First, HVFG discharged pollutants in violation of the permit in March 2006, when an employee accidentally released liquid manure from a truck that ran downhill into a creek. In October 2006, the DEC indicated in an annual inspection of HVFG facilities that there was "evidence of runoff discharged directly to a surface water." Conant Dec., Ex. L (CAFO Inspection Report at 6). Second, HVFG installed waste storage pits at one facility in 2004, and waste storage lagoons at another location in 2006, and in both instances failed to properly amend the CNMP for that location to reflect this change until February 2008. HVFG also failed to maintain a complete CNMP that included the waste handling operations and procedures at one of their facilities. Finally, neither the waste storage lagoon nor the waste storage pits were formally designed by a professional engineer, and neither were certified by an engineer until February 2008. Defendant also failed to document the waste storage periods for these structures until 2006 or 2007.[17] Though HVFG disputes certain aspects of these alleged violations, such as whether the violation is merely "technical" or involves a discharge into waterways, Defendant does not directly challenge the factual foundation for the claims. Given the further fact that all of these claims were addressed by the DEC in its Order on Consent with HVFG, it is clear that these violations of the CAFO SPDES Permit occurred. However, as described more fully below, the DEC's consideration of these violations also render Plaintiff's claims under this permit moot.


### D.  The Permit Violations Are Clean Water Act Violations

HVFG insists that it is not liable because most of the permit violations are not actually Clean Water Act violations. According to Defendant, the reporting and monitoring violations of the Slaughterhouse SPDES Permit do not involve a discharge into a navigable waterway and therefore cannot sustain liability. Similarly, since the CAFO SPDES Permit prohibits any discharge into waterways, it is actually not even a Clean Water Act permit. While creativity is to

---

[17] It is unclear precisely what "the waste storage periods" means. Neither the Plaintiff's expert witness, nor the DEC, who expressly considered it in the Order, explain how this is a violation. It is ultimately not relevant, as I find that these violations are moot.

be commended, this argument stretches credulity to its breaking point.  It is abundantly clear from the statutory language, case law, and the permits themselves that a violation of the requirements of either permit is a violation of the CWA.

Congress did not merely pass legislation that required "no dumping" signs posted along the waters of the United States, and whether a party is liable for a violation under the Clean Water Act is often not as simple as where a party discharged pollutants into a navigable waterway.  The CWA is a complex regulatory structure that established numerous detailed requirements for regulated parties, multiple enforcement mechanisms, and, most critically, a permit system to regulate the unfortunate reality of continuing water pollution.  "An NPDES permit serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations … of the individual discharger …" *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976).  While a discharge into a waterway in violation of a permit limit or prohibition is obviously a CWA violation,[18] it is the beginning, not the end of a permittee's responsibilities under the Act.  The Act deems compliance with a permit to be compliance for enforcement purposes, *see* 33 U.S.C. § 1342, and the obvious tradeoff is that noncompliance with its requirements, discharge or otherwise, is a violation and grounds for liability.  *See Atlantic States Legal Found., Inc. v. Eastman Kodak Co.*, 12 F.3d 353, 357 (2d Cir. 1993).  As federal regulations clearly explain, "[t]he permittee must comply with *all conditions of this permit … Any permit noncompliance* constitutes a violation of the Clean Water Act and is grounds for enforcement action…"  40 C.F.R. § 122.41(a) (emphasis added); *see also Laidlaw*, 528 U.S. at 174 ("noncompliance with a permit constitutes a violation of the act"); *Gwaltney*, 484 U.S. at 52 ("The holder…is subject to enforcement action…for failure to comply with the conditions of the permit.").  If HVFG had any further doubt as to whether it would face liability for reporting and monitoring violations of the Slaughterhouse SPDES Permit, or for violations of the "no-discharge" CAFO SPDES Permit, it need only look to the face of these permits.  Both unambiguously state that "any permit noncompliance" is a violation of the Clean Water Act.  *See* Slaughterhouse SPDES Permit, Part

---

[18] The discharge need not be directly into a navigable waterway, as Defendant also appears to argue.  "The Act does not forbid the addition of any pollutant *directly* to navigable waters from any point source, but rather the addition of any pollutant *to* navigable waters … Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates [the Act], even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between."  *Rapanos v. United States*, 547 U.S. 715, 743 (2006) (Scalia, J.).

II, § 1.f; CAFO SPDES Permit, § X.A.  A CAFO like HVFG is obligated to comply with all aspects of its permits, not merely the discharge limits or prohibitions, and may suffer liability under the Clean Water Act if it fails to do so.

It is likewise clear that HSUS can bring a citizen suit based on these violations.  Pursuant to the Act, a citizen suit may be commenced against anyone "alleged to be in violation of … an effluent standard or limitation under this chapter."  33 U.S.C. § 1365(a)(1)(A).  An "effluent standard or limitation" is defined in the same section and includes, "a permit or condition thereof issued under section 1342 of this title."  § 1365(f).  "There is nothing in the language or legislative history of the Act to suggest that a citizens' suit may seek to enforce only those conditions of an NPDES permit that regulate the quality of a discharge immediately before its release into navigable waters."  *Connecticut Fund for Env't v. Raymark Indus., Inc.*, 631 F. Supp. 1283, 1285 (D.Conn. 1986) (Cabranes, J.); *see also Waterkeeper Alliance*, 399 F.3d at 503-04 (describing importance for citizen to be able to "enforce the terms" of nutrient management plan); *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979, 988 (9th Cir. 1995) (collecting cases and stating, "[i]n fact, permit conditions that courts commonly enforce … are not effluent limitations, but rather requirements for retaining records of discharge sampling and for filing reports."); *Sierra Club v. Simkins Indus., Inc.* 847 F.2d 1109, 1115 (4th Cir. 1988) ("continuing reporting violations") (abrogated on other grounds).  It makes perfect sense for HSUS to sue for reporting and monitoring violations, in addition to discharge violations, given how critical these requirements are to a self-reporting permit system.  "Unless a permit holder monitors as required by the permit, it will be difficult if not impossible for state and federal officials charged with enforcement of the Clean Water Act to know whether or not the permit holder is discharging effluents in excess of the permit's maximum levels."  *Simkins Indus., Inc.* 847 F.2d at 1115; *see also Waterkeeper Alliance, Inc.*, 399 F.3d at 492 ("the NPDES permit is critical to the successful implementation of the Act").

### E.  Mootness

A citizen suit under the Clean Water Act is designed to "supplement, not supplant" state action, and may become moot when the EPA or state resolves the alleged violations through some form of enforcement.  *See Gwaltney,* 484 U.S. at 60.  According to HVFG, regardless of the relative merits of Plaintiff's case, the entire action was mooted after the DEC Consent Order.

Since the Order covered violations of both permits, and required HVFG to pay civil penalties and perform equitable relief, the company should not now be subjected to further punishment through this civil suit.  HSUS argues in response that none of the claims are moot because a number of the violations continued even after the Order was signed.

An action brought pursuant to the CWA only becomes moot where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189.  The test for mootness is "stringent," and the burden of proof lies with the party that makes this claim.  *Id.*  "Mootness doctrine thus protects defendants from the maintenance of suit under the Clean Water Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform." *Gwaltney,* 484 U.S. at 66-67.  State enforcement actions, such as a consent order, render an action moot where there is no realistic chance of a continuing violation.  "If the state enforcement proceeding has caused the violations alleged in the citizen suit to cease without any likelihood of recurrence – has eliminated the basis for the citizen suit – we believe that the citizen action must be dismissed." *Atlantic States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991).   Again, the critical element is that the state enforcement action must resolve the violations such that they are unlikely to recur; the citizen suit will not be rendered moot where there was no dispositive settlement or the action was not completely resolved.  *See id.* at 128; *Coalition for a Liveable West Side, Inc. v. New York City Dept. of Envtl. Protection*, 830 F.Supp. 194, 197 (S.D.N.Y. 1993) (cannot establish mootness where, despite DEC enforced remedial measures, "permit violations…continue and are likely to continue for at least several years").

This case presents a somewhat complicated scenario, as HVFG committed a number of distinct violations of two different SPDES permits.  However, mootness need not be an all-or-nothing question.  In *Atlantic States Legal Foundation v. Pan American Tanning Corporation*, the Second Circuit determined that a CWA action for civil penalties may continue even when a defendant sufficiently establishes that it has come into compliance to moot claims for injunctive relief.  *See* 993 F.2d 1017, 1020-21.  If the state enforcement action does not cover, or fails to resolve all of the permit violations, then those violations that are continuing or likely to recur need not and should not be mooted.

In this case, the DEC Order clearly resolved all of the violations of the CAFO SPDES permit. Each violation that was alleged by HSUS was expressly covered by the Order and resolved. *See* DEC Order, ¶ 9. Plaintiff here fails to provide any significant evidence to indicate that these violations are likely to recur, nor any evidence of recurrence during the nearly three years since the Order was signed.[19] To further consider violations of this permit, all of which were passed upon by the DEC, would be an impermissible attempt to second guess the state enforcement action. *See Atlantic States*, 933 F.2d at 127. Likewise, the discharge violations of pollutants in excess of the parameter levels in the Slaughterhouse SPDES Permit are sufficiently mooted by the DEC Order. The Order specifically mentioned these violations, and required HVFG to pay certain penalties and take remedial actions in response. *See* DEC Order, ¶ 12. As with the CAFO SPDES Permit violations, HSUS does not demonstrate that these discharge violations have recurred or are likely to do so. Shortly after HSUS filed suit, HVFG worked in good faith and diligently with the DEC to remediate certain violations, and three years later none of these particular violations have recurred. As such, all claims specifically enforced by the Order have been rendered moot.

However, the reporting and monitoring violations of the Slaughterhouse SPDES Order have not been mooted by the DEC Order. Although, as Defendant has repeatedly pointed out, the Order says that HVFG otherwise "appears to be in compliance," the reporting and monitoring violations were never expressly considered in the document. Nor does HVFG provide any other evidence to indicate that the DEC considered and resolved these violations. The fact that all of the other violations were directly listed in the Order persuades me that these particular violations were not contemplated, let alone resolved so as to moot HSUS' claims. Most damning, though, is the clear evidence that Defendant's violations continue and are likely to recur, e.g. their contention that the time of sampling is "irrelevant" to proper recordkeeping and the improper description of the Imhoff Cone testing method, which demonstrate that HVFG still does not understand or choose to follow these requirements of the permit. Further, HVFG's failure to properly report temperature because they believed that it is unnecessary in summer months, and their failure to maintain the original handwritten records of chlorine samples, both occurred after the DEC Order was signed. The DEC Order did not cover the reporting and monitoring

---

[19] Although Plaintiff notes that certain CAFO SPDES violations were not fully remediated for a period of time after the Order was signed, the DEC expressly provided for this time in the Order and otherwise extended the time to comply when some of HVFG's initial submissions were deemed inadequate.

violations of the Slaughterhouse SPDES Permit, and even if it had, HSUS has provided sufficient evidence that these violations have recurred or are likely to do so.

*                   *                   *

In summary, the undisputed material facts indicate that HVFG violated both its Slaughterhouse SPDES and CAFO SPDES Permits.  With regard to the Slaughterhouse SPDES Permit, HVFG (1) discharged pollutants – wastewater above the allowed temperature, chlorine, ammonia, settleable solids, phosphorous, and fecal coliform – in excess of the permit's parameter limits; and (2) failed to comply with a variety of reporting and monitoring requirements, described *supra*.  HVFG also violated its CAFO SPDES Permit because (1) it discharged pollutants despite its "no discharge" requirement; (2) failed to properly maintain and amend its Comprehensive Nutrient Management Plan, and; (3) failed to properly design and certify its waste storage structures.  Although there is sufficient evidence to sustain each of these permit violations, the DEC Order entered into by HVFG expressly encompassed all of the CAFO SPDES Permit violations, as well as the excess discharge violations of the Slaughterhouse SPDES Permit.  Since these violations were fully resolved and there is no evidence or likelihood of recurrence, Plaintiff's claims based on these violations are rendered moot.  However, HVFG remains liable for the reporting and monitoring violations of the Slaughterhouse SPDES Permit because it was not covered by the DEC Order, and because there is evidence that the violations continued to occur after the Order was signed.

### F.  Remedies

In each case brought pursuant to § 1365(a), "the district court has discretion to determine which form of relief is best suited, in the particular case, to abate current violations and deter future ones." *Laidlaw*, 528 U.S. at 192; *see also Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*,  451 F.3d 77, 87 (2d Cir. 2006) ("District courts have broad discretion in calculating civil penalties under the CWA.").  The Act authorizes a court to order civil penalties and injunctive relief.  *See* 33 U.S.C. § 1365(a) ("shall have jurisdiction … to enforce such an effluent standard or limitation … and to apply any appropriate civil penalties").  The Clean Water Act authorizes civil penalties of up to $25,000 per day for each violation.[20] 33

---

[20] New York law authorizes the DEC to issue a statutory maximum of $37,500 in civil penalties per day for each violation.  *See* N.Y. Envtl. Conserv. Law § 71-1929(1).

U.S.C. § 1319(d).  "In calculating civil penalties under the CWA, the court may begin either with the violator's estimated economic benefit from noncompliance (known as the 'bottom-up' method) or with the statutory maximum allowable penalty (known as the 'top-down' method)," and may then make appropriate adjustments.  *Trout Unlimited*, 451 F.3d at 87; *see also* § 1319(d).

### 1. Civil Penalties

In many Clean Water Act cases, a defendant may voluntarily come into sufficient compliance with its permit obligations to such an extent that an injunction would be an unnecessary burden, while a civil penalty will still issue to deter future violations and compensate for the prior environmental harm and corresponding economic benefits of being an environmental scofflaw.  *See, e.g., Laidlaw*, 528 U.S. at 192-93.  This case presents the opposite situation.  Though HVFG remains in violation of certain permit requirements, it clearly made a good-faith effort to resolve its permit issues with the DEC and already has paid significant financial penalties as a result.  Further, HSUS has not shown that HVFG has discharged any pollutants in violation of its permits since its signed the DEC Order, and the only violations for which it remains liable are reporting and monitoring requirements.  Notably, though they still suggest HVFG should be liable for $550,000 to over $600 million in civil penalties for these violations, HSUS generally agrees that these penalties are not necessary in this case if other remedial relief is ordered.  In light of Defendant's decision to voluntarily work with the state environmental agency to remediate its violations, its payment of civil and equitable penalties as part of the DEC Order, and a lack of any evidence of further actual improper pollutant discharges, I find that civil penalties are not appropriate in this case.

### 2. Injunctive Relief

An injunction does not issue automatically upon a finding of a Clean Water Act violation, but rather Plaintiff must still demonstrate irreparable harm.  *See City of New York v. Anglebrook Ltd. P'Ship*, 891 F. Supp. 908, 925 (S.D.N.Y. 1995) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982); *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987)).  In this unusual case, injunctive relief as set out below, is actually more appropriate than further civil penalties.  Though HVFG already paid a significant fine to the DEC, it remains clear that HVFG still does not fully understand its obligations under its SPDES permits.  Defendant's conflicted and multiple responses to its reporting violations indicates that it lacks a firm grasp of what it

must do to be a responsible environmental citizen under the CWA permit system.  The requirements of these SPDES Permits are detailed, technical, and complex, and it is hardly mindboggling that Defendant does not know how to properly comply with them.  As Plaintiff points out, the improper monitoring and recordkeeping makes it impossible to accurately determine whether there has been any improper discharges of pollutants by HVFG; this is precisely the sort of irreparable harm that merits an equitable remedy.  As such, mandatory injunctive relief to ensure HVFG accurately carries out its reporting and recordkeeping responsibilities would be in the best interest of all concerned.  Plaintiff's desire to protect the Mongaup River and its environs is commendable and will come closer to fruition with a remedy that calls for more easily verified data and better reporting and monitoring.  Defendant will benefit from a reduced risk of future CWA liability because it will better understand its obligations under both permits.  To accommodate those goals,

(1)  HVFG will for nine (9) months, to begin August 1, 2010 and concluding February 1, 2011, ensure full compliance with their reporting and recordkeeping obligations.

(2)  By no later than thirty (30) days from the date of this Order, HVFG and HSUS will submit to this Court the name of a mutually agreed-upon and available Clean Water Act compliance expert (the "CWA Expert" or "Expert").  The CWA Expert must have experience with the New York SPDES Permit system, and have a clear understanding of what constitutes proper recordkeeping and reporting as required by the Slaughterhouse SPDES Permit.  Prior work experience with the DEC is particularly favored.

(3)  If the parties cannot agree upon a particular expert within those thirty (30) days, they will within five (5) days thereafter, i.e. the 35th day, each submit to this Court the names and backgrounds of two available experts.  The Court will then designate one of these individuals as the CWA Expert.  HVFG will pay for the services of the Expert.

(4)  Within thirty (30) days of the date that the CWA Expert is chosen, HVFG shall meet with him or her at the HVFG facilities, submit their records and reports for evaluation, and correct any improper recordkeeping or reporting practices identified by the Expert.

(5)  The Expert shall only review the recordkeeping and reporting requirements that HVFG violated, as described by this Opinion and Order.  Within seven (7) days from the date of this initial meeting, the Expert will submit a report to both HVFG and HSUS that details the results of his or her compliance review.

(6) After the initial compliance meeting, the CWA Expert will return to the HVFG facilities once every thirty (30) days for the next nine months.  HVFG is expected to cooperate with the expert and to be in full and strict compliance with all of its recordkeeping and reporting requirements throughout the nine month period.

(7) The CWA Expert will provide a detailed, written certification that either confirms HVFG is in compliance, or that it remains in violation of certain permit requirements.  This certification report will be submitted to HSUS and this Court no later than seven (7) days after each inspection.  Two successive reports of still-existing violations will result in a penalty of $30,000.  Additional reports of violations during the injunctive period will result in a penalty of $50,000 per reported violation.  It is the responsibility of HSUS to notify the Court of violations that might subject HVFG to civil penalties.

(8) After the CWA Expert has met with HVFG for nine months, he will issue a final written certification report.  If the report states that HVFG is in complete compliance with its recordkeeping and reporting obligations, this injunction will be dissolved without further recourse.  If the report concludes that HVFG continues to violate its recordkeeping or reporting obligations, HVFG will be subject to a penalty of $25,000 per day per violation until corrected and approved by the Expert.

### 3.  *Costs and Attorney's Fees*

Under the CWA, a district court also "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate."  33 U.S.C. § 1365(d); *Laidlaw*, 528 U.S. at 175.  The parties are instructed to submit briefs of no more than five (5) pages on the costs and attorney's fees sought in this case, with substantiation for time spent, within twenty (20) days of the date hereof.

### 4.  *Other Equitable Relief*

A district court retains its traditional discretion to award equitable relief in a Clean Water Act suit so that it may "enforce such an effluent standard or limitation" and ensure that the purpose of the Act is satisfied.  *See* 33 U.S.C. § 1365(a); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 318 (1982) (statute permits "the exercise of a court's equitable discretion … to order relief that will achieve *compliance* with the Act").  Though an injunction is the most frequently considered equitable relief, the court retains its full panoply of equitable powers.  *See United*

*States v. City of Niagara Falls*, 706 F. Supp. 1053, 1059 (W.D.N.Y. 1989) ("the district court…retains the full measure of equitable discretion in fashioning appropriate enforcement relief"); *Coalition for a Liveable West Side, Inc. v. New York City Dept. of Envtl. Protection*, No. 92 Civ. 9011, 1998 WL 78285, at *5 (S.D.N.Y. Feb. 24, 1998) (considering but ultimately denying request for appointment of special master); *see also U.S. Pub. Interest Research Group v. Atlantic Salmon of Me., LLC*, 339 F.3d 23, 32 (1st Cir. 2003) ("once a citizen suit is brought and establishes a present violation, there is nothing in the statute or in *Gwaltney* that prevents a court from ordering equitable relief to remedy the harm done in the past"); *Natural Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000) (In CWA suit, "[s]o long as the district court's equitable measures are reasonably calculated to remedy an established wrong, they are not an abuse of discretion") (internal citations and quotations omitted).

Both parties submitted letter briefs to the Court to provide their view of appropriate remedies in light of Defendant's reporting and recordkeeping violations. HSUS stated that an environmental project, paid for by HVFG in the amount of $100,000, would be an appropriate alternative to civil penalties. HVFG, to its credit, agreed to fund an environmental project to remediate its CWA violations, but believes a payment of $15,000 is proper. I agree that an environmental project paid for by Defendant would be suitable and just in lieu of civil penalties. In light of the facts of this case and given the much larger civil penalties that could be imposed for these violations, a $50,000 payment by HVFG to a suitable project is appropriate. An appropriate project should be related to the same sort of concerns raised by the violations at issue in this litigation, i.e. monitoring and tracking water pollution levels in the navigable waterways where pollutants discharged by HVFG may ultimately end up. HSUS has already recommended an organization for just such a purpose, but provided little in the way of details. The parties are instructed to discuss such a project and come to agreement on the details. This court will retain jurisdiction to resolve questions involving the relief granted above.

### III.  CONCLUSION

For the reasons described above, Plaintiff's Motion for Summary Judgment is GRANTED to the extent that it has proved Defendant's reporting and monitoring violations of its Slaughterhouse SPDES Permit, and DENIED to the extent that all of the CAFO SPDES

Permit violations, and the discharge violations of the Slaughterhouse SPDES Permit, have been rendered moot by the New York DEC Order on Consent.

The Clerk of the Court is instructed to close the relevant motions and remove them from my docket.

**SO ORDERED**
**May 17, 2010**
**New York, New York**

**Hon. Harold Baer, Jr.**
**U.S.D.J.**

26