**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **THE HUMANE SOCIETY OF THE UNITED STATES,** **Plaintiff,** | : | **06 CV 6829 (HB)** |
| **- against -** | : | |
| **HVFG, LLC.** **Defendant.** | : | **OPINION & ORDER** |

**Hon. Harold Baer, Jr., District Judge*:**

Presently before this Court are cross-motions for attorneys' fees and costs, pursuant to the fee shifting statute in the Clean Water Act. Plaintiff, The Humane Society of the United States ("Plaintiff" or "HSUS"), claims that it prevailed when the Court sustained certain reporting and recordkeeping violations of Clean Water Act permits held by the defendant. Defendant, HVFG, LLC ("Defendant" or "HVFG"), also asserts that it prevailed and is owed fees and costs, because some of the violations alleged by the plaintiff were deemed moot. For the reasons that follow, Plaintiff's motion is GRANTED and Defendant's motion is DENIED.

## I. BACKGROUND

HSUS brought this suit against HVFG, a foie gras manufacturer, for violations of the Clean Water Act (the "Act" or "CWA"). *See* 33 U.S.C. § 1365 (2010).[1] In its initial complaint, filed on September 6, 2006 after service of a statutory 60-day notice, Plaintiff alleged violations of Defendant's "Slaughterhouse SPDES Permit," claiming that "defendant has and will continue to violate section 301(a) of the CWA by discharging chlorine, phosphorous, and other pollutants into the Middle Mongaup River in violation of the effluent limits and other requirements in defendant's [SPDES] permit." Compl. ¶ 2 (Sept. 6, 2006) (Docket No. 1). Specifically, HSUS

* John Miller, a third-year law student at New York University School of Law, and a summer 2010 intern, provided substantial assistance in researching this Opinion.

[1] Only background relevant to the issue of attorneys' fees and costs are discussed here. Familiarity with the facts of this case are presumed, and are discussed in more detail in this Court's Opinion and Order on Summary Judgment. *See Humane Soc. of U.S. v. HVFG, LLC*, No. 06 Civ. 6829(HB), 2010 WL 1837785, at *1 (S.D.N.Y. May 18, 2010).

alleged that HVFG discharged a variety of pollutants in excess of the amount provided in the permit, including excess discharge of chlorine 648 times, fecal coliform 6 times, and the phosphorous levels in the discharge was exceeded by 300 percent. HSUS also claimed that HVFG failed to properly report these discharges, and that it had not properly posted a sign as to the location of its discharge pipe. *See id.* ¶¶ 34, 40, 41. Plaintiff sought a declaratory judgment, injunctive relief, and imposition of civil penalties in the amount of $27,500 per day per violation, in addition to fees and costs for the litigation. *Id.* ¶¶A-D.

After filing a second 60-day notice, HSUS filed an Amended Complaint on March 6, 2007, that incorporated alleged violations of a second permit, the "CAFO SPDES Permit." *See* Am. Compl. (Mar. 6, 2007) (Docket No. 18). This time, Plaintiff alleged that "defendant has and will continue to violate section 301(a) of the CWA by discharging chlorine, phosphorus, manure, and other pollutants into the Middle Mongaup River in violation of effluent limits and by failing to comply with monitoring, reporting, and operating requirements established by the two state-issued Clean Water Act permits applicable at defendant's facility." *Id.* ¶ 2. Specifically, the Amended Complaint clarified that the violations of the Slaughterhouse SPDES Permit included reporting and record keeping violations related to the aforementioned wrongful discharges. *See id.* ¶¶ 30-42. With regard to the CAFO SPDES Permit, it alleged a number of violations: "(1) discharging pollutants, including '[c]ontaminated runoff from the back of the barn . . . flowing to the adjacent pond,' (2) constructing and operating a manure lagoon without an engineered design, an operation and maintenance plan, or an emergency action plan, (3) failing to maintain records, properly report all discharges, or record levels of manure in waste storage containers to prevent overflow, (4) operating a new manure lagoon without modifying defendant's manure management plan, or CNMP, to reflect the expansion, (5) commencing operations at a new satellite farm on Fittkau Road without modifying defendant's CNMP to reflect the expansion, and (6) failing to comply with operational requirements of the CAFO General Permit, including failing to install a fence around waste containment structures." *Id.* ¶ 48. The Amended Complaint noted that HVFG had filed a consent order with the New York Department of Environmental Conservation ("DEC" or "NY DEC"), but alleged that this had not remedied all of the noticed violations. *Id.* ¶¶ 49-52. HSUS made the same requests for declaratory, injunctive, and civil penalties, but now sought $32,500 per day per violation. *Id.* ¶ C.

On December 22, 2009, the parties cross-moved for summary judgment. On summary judgment, "Plaintiff claim[ed] that Defendant violated its Slaughterhouse SPDES Permit through (1) discharges in excess of the permitted levels for temperature, chlorine, settleable solids, phosphorous, ammonia, and fecal coliform; (2) improper calibration and use of temperature, chlorine, and settleable solid testing equipment; (3) failure to take discharge reporting samples at proper locations; (4) failure to properly record the time, location, and chain of custody for discharge reporting samples; (5) failure to correctly report temperature on certain dates; and (6) failure to show a basis for certain chlorine sample reports. Plaintiff claim[ed] the Defendant violated its CAFO SPDES Permit through (1) impermissible discharges of pollutants in 2005 and 2006; (2) failure to properly complete and maintain a Comprehensive Nutrient Management Plan; and (3) improper storage of waste in a lagoon and storage tanks not constructed or certified by an engineering professional." *Humane Soc. of U.S. v. HVFG, LLC*, No. 06 Civ. 6829(HB), 2010 WL 1837785, at *3. (S.D.N.Y. May 18, 2010).[2] Plaintiff argued that Defendant could be subject to between $550,000 to over $600 million in civil penalties, depending on how they were calculated by the Court. On May 6, 2010, this Court filed an Opinion and Order that granted in part and denied in part both Plaintiff and Defendant's motions.[3] The determination was summarized as follows:

> "[T]he undisputed material facts indicate that HVFG violated both its Slaughterhouse SPDES and CAFO SPDES Permits. With regard to the Slaughterhouse SPDES Permit, HVFG (1) discharged pollutants-wastewater above the allowed temperature, chlorine, ammonia, settleable solids, phosphorous, and fecal coliform-in excess of the permit's parameter limits; and (2) failed to comply with a variety of reporting and monitoring requirements, described *supra.* HVFG also violated its CAFO SPDES Permit because (1) it discharged pollutants despite its "no discharge" requirement; (2) failed to properly maintain and amend its Comprehensive Nutrient Management Plan, and; (3) failed to properly design and certify its waste storage structures. Although there is sufficient evidence to sustain each of these permit violations, the DEC Order entered into by HVFG expressly encompassed all of the CAFO SPDES Permit violations, as well as the excess discharge violations of the Slaughterhouse SPDES Permit. Since these violations were fully resolved and there is no evidence or likelihood of recurrence, Plaintiff's claims based on these violations are rendered moot. However, HVFG remains liable for the reporting and monitoring violations of the Slaughterhouse SPDES Permit because it was not

[2] Plaintiff withdrew its request for liability based on certain alleged CAFO SPDES violations prior to January 1, 2007. *See HVFG*, 2010 WL 1837785, at *3 n.10.

[3] The Opinion and Order was amended on May 18, 2010 to correct certain clerical errors that did not affect or alter the substance of the decision.

> covered by the DEC Order, and because there is evidence that the violations continued to occur after the Order was signed."

*HVFG*, 2010 WL 1837785, at *13. In other words, I found that there were violations of both SPDES permits, but that all violations of the CAFO SPDES Permit, as well as all discharge violations of the Slaughterhouse SPDES Permit, were rendered moot by the DEC consent order. The only sustained violations were the reporting, monitoring, and recordkeeping violations of the Slaughterhouse SPDES Permit. In terms of relief, I determined that no civil penalties were warranted since HVFG had already paid substantial fines to the DEC as part of the consent order, but that equitable relief in the form of a mandatory audit by a CWA Expert and a $50,000 donation to an environmental benefits project were appropriate. *See HVFG*, 2010 WL 1837785, at *14-15. The parties were instructed to file briefs for consideration of attorneys' fees and costs. *Id.* at *16.

Both parties claim they are entitled to attorneys' fees and costs as "prevailing parties." After initial briefs were filed, this Court requested additional documentation to clarify the fees associated with the sustained claims versus those that were deemed moot. HSUS claims that it prevailed *in toto*, and that it expended $1,157,248.84 in fees. Plaintiff initially reduced the amount of fees requested to $708,974.46 after making deductions for certain unnecessary work along with a voluntary across-the-board reduction of 15%. After the Court's request for additional itemization of fees, Plaintiff reduced its request further to $648,363.61 in fees. Plaintiff also initially requested $137,735.67 in costs and expenses, and subsequently reduced the request to $131,141.15. HVFG requests between $299,997.00 to $449,995.50 in fees, depending on whether the Court finds the attorney's reduced or regular rate to be appropriate. Defendant also seeks $43,809.00 in costs and expenses.

## II. DISCUSSION

Under the Clean Water Act, a "court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). The general analyses developed by the federal courts to determine who is a prevailing party and to assess fees and costs are applicable to Clean Water Act litigation. *See, e.g., J.C. v. Reg'l Sch. Dist. 10, Bd. of Educ.*, 278 F.3d 119, 123 (2d

Cir. 2002) (standards "used to interpret the term 'prevailing party' under any given fee-shifting statue are generally applicable in all cases in which Congress has authorized an award of fees to a prevailing party.") (internal quotations omitted); *Natural Res. Def. Council, Inc. v. Fox,* 129 F. Supp. 2d 666, 669-674 (S.D.N.Y. 2001) (applying traditional fee-shifting analysis to CWA claim); *Coal. for Liveable West Side, Inc. v. New York City Dept. of Envtl. Protection*, No. 92 Civ. 9011(DAB), 1998 WL 299938, at *1 (S.D.N.Y. June 9, 1998) (same). This involves a two step analysis. First, the court must determine whether the party is a "prevailing party," and second, it must decide if the fees that are requested are reasonable. *See Liveable West Side*, 1998 WL 299938 at *1 (citing *Pino v. Locascio,* 101 F.3d 235, 237 (2d Cir.1997)).

**A. Prevailing Party**

"'[I]n order to be considered a 'prevailing party' … a plaintiff must not only achieve some material alteration of the legal relationship of the parties, but that change must also be judicially sanctioned … That is, plaintiffs are only eligible for attorneys' fees if they 'achieve some material alteration of the legal relationship' between them and their adversaries, *and* that change bears a 'judicial imprimatur.'" *Perez v. Westchester Cnty. Dept. of Corr.*, 587 F.3d 143, 149 (2d Cir. 2009) (quoting *Roberson v. Giuliani*, 346 F.3d 75, 79-80 (2d Cir. 2009)); *see also Fox*, 129 F. Supp. 2d at 669. In the present case, it is clear that HSUS was a prevailing party, as it was granted summary judgment on the ground that HVFG violated the CWA by failing to fulfill its reporting and testing requirements. That is not to say I find Plaintiff's victory to have struck at the very heart of some nefarious environmental scofflaw — rather this comes closer to a case where a defendant ignorant of the strict CWA regulatory regime met up with an unbending plaintiff that chose to litigate based primarily on its unrelated opposition to foie gras industry practices. Regardless, there is enough here to warrant an award of fees and costs.

By contrast, Defendant cannot be deemed a prevailing party, even in part, in this action. First, in order to prevail, a party "must receive some relief on the merits … as, for example, when they win a judgment on the merits or obtain 'settlement agreements enforced through a consent order.'" *Perez*, 587 F.3d 143, 150 (2d Cir. 2009) (quoting *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Res.*, 532 U.S. 598, 603-04 (2001)). Here, HVFG was granted partial summary judgment because certain claims were deemed moot, which is not equivalent to "relief on the merits," such as a determination that there was no CWA

violation. *See Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688 n.9 (1983) ("we do not mean to suggest that trivial success on the merits, or purely procedural victories, would justify an award of fee"); *United States v. Hooker Chem. & Plastics Corp.*, 591 F. Supp. 966, 968 (W.D.N.Y. 1983) ("Nor may fees be awarded for purely procedural victories."); *see also Farrar v. Hobby*, 506 U.S. 103, 119 (1992) ("[T]he occurrence of a purely technical or *de minimis* victory is such a circumstance. Chimerical accomplishments are simply not the kind of legal change that Congress sought to promote in the fee statute.").

Second, and more importantly, even if Defendant were deemed to be a "prevailing party" for the mooted claims, "[u]nder the CWA, a prevailing defendant must meet a stricter standard than a prevailing plaintiff to receive an award of fees." *Coon v. Willet Dairy, LP*, Nos. 5:02 Civ. 1195(FJS/GJD), 5:04 Civ. 917(FJS/GJD), 2009 WL 890580, at *1 (N.D.N.Y. Mar. 31, 2009) (citing *Atl. States Legal Found., Inc. v. Onondaga Dep't of Drainage & Sanitation*, 899 F.Supp. 84, 87 (N.D.N.Y. 1995)); *see also Panetta v. Crowley*, 460 F.3d 388, 399 (2d Cir. 2006) ("Fees are regularly awarded to prevailing plaintiffs who obtain some significant measure of relief but not to prevailing defendants."). Defendant must show that Plaintiff's claims were "frivolous, unreasonable, or groundless." *Panetta*, 460 F.3d at 388 (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)); *Coon*, 2009 WL 890580 at *1 (applying *Christianburg* to CWA action and noting that "even an entirely successful defendant may not be entitled to an award of fees."). In this action, I determined that HVFG had committed CWA violations based on both SPDES Permits, and only mooted certain claims due to Defendant's consent order with the state that was entered subsequent to the filing of this lawsuit. Moreover, Plaintiff did not continue to litigate claims that "clearly became frivolous." Although HVFG entered a consent order, HSUS believed that the settlement did not cover all of the CWA violations that Defendant had committed. Their belief was born out, in part, when I sustained violations of the Slaughterhosue SPDES Permit. Although all of Plaintiff's claims with regard to the CAFO SPDES Permit were ultimately rendered moot by the consent order, it was apparent that they moved forward in good faith and even sought to narrow their claims by withdrawing their claim for liability based on alleged violations of the CAFO SPDES Permit that occurred prior to January 1, 2007. Plaintiff actually prevailed on some of their claims, and the ones that were mooted were not litigated in bad faith or clearly frivolous. As such, Defendant is owed no attorney's fees or costs related to this litigation.

**B. Reasonable Fee Determination**

As a prevailing party, Plaintiff must demonstrate that the fees requested are reasonable. "[T]he district court has discretion to determine the appropriate fee award in view of its 'superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.'" *Friends of the Earth v. Eastman Kodak Co.*, 834 F.2d 295, 298 (2d Cir. 1987) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). Traditionally, the "lodestar" approach, which is "multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate," *See Fox*, 129 F. Supp. 2d at 670, has been the touchstone of this analysis. This standard has been modified by the Second Circuit in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty. Bd. of Elections*. *See* 522 F.3d 182, 190 (2d Cir. 2008) ("This opinion abandons its use."); *but see McDow v. Rosado*, 657 F. Supp. 2d 463, 467 (S.D.N.Y. 2009) ("It is not obvious how [*Arbor Hill's*] process substantively differs from the lodestar approach … "). Pursuant to *Arbor Hill*, courts must determine a "'reasonable hourly rate,' bearing in mind all the case-specific variables, and the court then uses that reasonable hourly rate to calculate the 'presumptively reasonable fee' by multiplying the rate by the number of hours reasonably expended." *Adorno v. Port Auth.*, 685 F. Supp. 2d 507, 510-511 (S.D.N.Y. 2010) (quoting *Arbor Hill*, 522 F.3d at 190). While there is some confusion as to precisely how a court is expected to perform this analysis, it essentially boils down to a four-step process: (1) determine the reasonable hourly rate (2) determine the number of hours reasonably expended; (3) multiply the two to calculate the presumptively reasonable fee; and (4) make any appropriate adjustments to arrive at the final fee award. *See Adorno*, 685 F. Supp. 2d at 511; *McDow*, 657 F. Supp. 2d at 467.[4] As part of the reasonableness analysis, the district court is expected to consider the factors first enumerated in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).[5] *See Arbor Hill*, 522 F.3d at 187 n.3; *Adorno*, 685 F. Supp. 2d

---

[4] The precise mechanics of the analysis are not a major concern. "While the analysis could be described as a multi-step or single-step process, referring to either a 'lodestar' or a 'presumptively reasonable fee,' happily the result should be the same." *McDow*, 657 F. Supp. 2d at 467-68.

[5] The factors include: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *See Arbor Hill*, 522 F.3d at 187 n.3 (citing *Johnson*, 488 F.2d at 717-19).

at 511. Finally, courts may adjust the presumptively reasonable fee based on the degree of success of the prevailing party. *See Adorno*, 685 F. Supp. 2d at 511 ("Although the court in *Arbor Hill* did not explicitly explain what should happen once the 'presumptively reasonable fee' was set, courts have been adjusting the 'presumptively reasonable fee' for traditional factors such as the degree of the plaintiff's success.") (citing, *inter alia*, *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 151 (2d Cir. 2008)).

1. Reasonable Rate

A reasonable hourly rate is "the rate a paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 190; *see also Adorno*, 685 F. Supp. 2d at 511. "A court may determine the reasonable hourly rate by relying both on 'its own knowledge of comparable rates charged by lawyers in the district,' … as well as on 'evidence proffered by the parties.'" *Adorno*, 685 F. Supp. 2d at 511 (internal quotations omitted); *see also Fox*, 129 F. Supp. 2d at 674. The hourly rate must be based on "prevailing market rates," which means "[r]ates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation … regardless of whether plaintiff is represented by private or nonprofit counsel." *Fox*, 129 F. Supp. 2d at 673 (quoting *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) and *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The hourly rate for nonprofit counsel "must be exercised on the basis of rates charged to clients of private law firms." *Fox*, 129 F. Supp. 2d at 673 (internal citation omitted), but it would seem prudent that the Court be mindful of an attorney's *pro bono* status, since "a client might be aware that the attorney expected low or non-existent remuneration" and because counsel earned other returns from that work, such as enhanced reputation. *Arbor Hill*, 492 F.3d at 112.

HSUS utilized in-house counsel as well as a variety of law firms to prosecute its case, and has therefore provided a variety of different rates charged for its fee application. Most of the rates are not specifically challenged by Defendant, and based on a review of HSUS's briefing papers and supporting documents, the majority of rates applied are reasonable and consistent with those charged in the community. However, two sets of hourly rates give me some pause and merit adjustment.

First, Plaintiff seeks a rate of $400 per hour for the law firm of Egert and Trakinski, despite the fact that the firm only charged HSUS $285 per hour. A fee award is not "necessarily

limited because the attorney has agreed to undertake the case for a reduced fee compared to the customary market rate." *Arbor Hill*, 522 F.3d at 184 n.2 (internal citation omitted). However, the Circuit has indicated that, "[n]evertheless, the nature of representation and type of work involved in a case are critical ingredients in determining the reasonable hourly rate," and that "[t]hese factors may justify compensating an attorney at a rate lower than his or her customary rate for a different type of practice, regardless of whether the attorney has agreed to take the case on a *pro bono* or reduced-fee basis." *Id.* An independent review of the submitted records indicate that the majority of the work was to review materials submitted by HSUS or provided to HSUS, along with conducting a few depositions, and there is little other independent work product created by the firm. While such tasks are not inherently unreasonable, the "nature of representation" was essentially as supporting counsel, and most of this "type of work" was not exactly essential to the suit.[6] As such, I find that $400 per hour is not a reasonable rate. Given the supporting role played by this firm, the reasonable rate is the rate the client, here HSUS, would have and did actually pay — $285 per hour.

The second issue is the rate charged by Adam Haikki and Daniel Lewis, a partner and associate, respectively, at Shearman & Sterling LLP, who worked *pro bono* on this suit for Plaintiff and seek $950 and $630 per hour for their work. Plaintiff, through a declaration from Mr. Haikki and associated supporting documents, provides some evidence that partners and associates at large firms like Shearman & Sterling do at times charge in excess of $900 and $600 per hour. So far as Mr. Haikki's claimed rate goes, he became involved in this suit fairly late in the game, and primarily acted in a supporting role for Daniel Lewis, an associate at Shearman & Sterling who presented the oral argument on the summary judgment motions on behalf of HSUS. More significantly, the partners who charged $900 or more per hour were typically more experienced, in terms of years admitted to the New York Bar, than Mr. Haikki. This is not to say counsel lacks experience, he may indeed be wise beyond his years. But given his fairly limited role and comparatively less experience as compared to partners who typically charge those rates, $950 per hour does not appear to be a reasonable rate, or for that matter one that HSUS would have paid if it were a paying client. Based on the survey of hourly rates for attorneys at similar law firms provided by Plaintiff, a more appropriate rate is $750 hour, as this is near the upper

[6] Indeed, the attorneys from this firm claim to be specialists in animal law. How this made them particularly well-suited to review materials in a Clean Water Act litigation is entirely unclear, and suggests that their rate is owed no particular deference based on area of expertise.

range of partners who were admitted to the Bar at or around the same time as Haikki. Mr. Lewis' rate is more appropriate compared to other mid-level to senior associates at large firms.

Most significantly, while the Court always seeks to encourage *pro bono* work by members of the bar, there is simply no indication that a non-profit entity like HSUS would have agreed to pay the high rates commanded by lawyers at large corporate firms like Shearman & Sterling save for the fact that these lawyers volunteered for the opportunity to do so. Additionally, the prestige or enhancement to the firm's reputation associated with taking a significant *pro bono* case is likely of more value to counsel, as evidenced by their noble, stated intention to donate their fees to charity. This is a relatively clear example of where a reasonable client would assume that "the attorney expected low or non-existent remuneration." *Arbor Hill*, 492 F.3d at 112. Since HSUS was actually charged rates of $200 to $300 per hour by all other counsel, this Court finds that a reasonable fee HSUS would have paid Mr. Haikki and Mr. Lewis would be at most $400 and $250 per hour, respectively.

2. Reasonable Hours

With regard to the "reasonable hours" requested, Plaintiff bears the burden of properly identifying the source and nature of the time expenditures. *See Hensley,* 461 U.S. at 437. The court may consider its own familiarity with the action, its general experience, and the submissions and arguments of the parties. *See Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992). "[A]djustments must be made to hours based on case-specific factors, including, for example, deductions for excessive, redundant or otherwise unnecessary hours." *Adorno*, 685 F. Supp. 2d at 512 (quoting *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.1999)); *see also Fox*, 129 F. Supp. 2d at 673 (exclude "hours not reasonably expended"). Where it is not possible to precisely quantify the hours that should be eliminated, the court may resort to an overall percentage reduction. *See Guardians Ass'n of Police Dept. v. City of New York*, 133 Fed. Appx. 785, 786 (2d Cir. 2005) ("excessive, redundant, or unnecessary hours are to be excluded from a fees award, and a district court may apply a reasonable percentage reduction as a practical shortcut to do so").

HSUS has done a reasonable job in cutting away fees that were excessive, redundant, or unnecessary. Plaintiff claims that its attorneys spent 3,735.03 hours on this matter. HSUS reduced this claim to 2961.28 hours, an approximately 20% reduction, most of which comes

from time spent by attorneys from Shearman & Sterling in preparation for trial. HSUS also excluded fifty hours of work incurred in 2006 or that could be deemed duplicative. Additionally, as noted, *supra*, Plaintiff voluntarily applied an across-the-board 15% reduction to its fee request. This was a relatively fiercely litigated, and complicated, regulatory action that has now lasted for almost four years. There were a number of discovery disputes, multiple briefings (many, notably, instigated by Defendant), and a substantial amount of supporting documentation marshaled in support of motion practice. A little under three thousand hours, essentially equivalent to a year-and-a-half of billable hours by one attorney at a large law firm, is not unreasonable. While HVFG suggests further cuts are appropriate, I find the 20% reduction in hours based on specific items deemed unnecessary, coupled with the additional 15% voluntary reduction to the overall fee request, sufficient to "trim the fat" and render a reasonable number of hours expended. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998).

3. <u>Presumptively Reasonable Fee</u>

The rates, modified as described *supra*, applied to the reasonable hours claimed, initially comes out to a $592,180.17 presumptively reasonable fee request.[7] This is $56,183.44 less than the amount Plaintiff sought as a reasonable fee.

4. <u>Adjustments – Degree of Success</u>

The primary dispute between the parties, however, is whether the presumptively reasonable fee should be reduced further based on the degree of success. "The most critical factor to determining a reasonable fee is the degree of success obtained." *Fox*, 129 F. Supp. 2d at 670 (internal quotations omitted); *see also Adorno*, 685 F. Supp. 2d at 512 (same). When a party prevails on fewer than all of its claims, a court must ask (1) did the plaintiff fail to prevail on claims unrelated to the claims on which he succeeded and (2) did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award. *See Fox*, 129 F. Supp. 2d at 670. "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The

[7] Egert and Trakinski's reasonable fee is based on the actual rate billed ($285) by the number of hours requested (283.15). The reasonable fee for Shearman & Sterling LLP was calculated by multiplying the reduced rate for Mr. Haikki ($400) by the hours he specifically claimed (34), while Mr. Lewis' fee was similarly reduced ($250 multiplied by 59.5 hours). Finally, the 15% reduction in fees that Plaintiff applied was reconfigured into both figures. The other fee amounts remain the same as requested, with the 15% reduction applied by Plaintiff still included.

court necessarily has discretion in making this equitable judgment.'" *Id.* (quoting *Hensley*, 461 U.S. at 437).

Although Plaintiff contends it had only "one claim," a violation of the CWA, and that it prevailed, this is not entirely correct. The plaintiff sought relief based on violations of two discrete SPDES permits, and for particular discrete violations of each permit, including both discharge and reporting and record keeping violations. The fact of the matter is that a significant portion of the claimed violations were deemed moot due to the DEC consent order. "[A] district judge's authority to reduce the fee awarded to a prevailing plaintiff below the lodestar by reason of the plaintiff's 'partial or limited success' is not restricted either to cases of multiple discrete theories or to cases in which the plaintiff won only a nominal or technical victory." *Kassim v. City of Schenectady*, 415 F.3d 246, 256 (2d Cir. 2005); *see also Barfield*, 537 F.3d at 152 ("assessment of the 'degree of success' achieved in a case is not limited to inquiring whether a plaintiff prevailed on individual claims"). Rather, "the quantity and quality of relief obtained, as compared to what the plaintiff sought to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved." *Barfield*, 537 F.3d at 152; *see also McDow*, 657 F. Supp. 2d at 469. While it is clear that Plaintiff did not entirely succeed, the issues in which Plaintiff prevailed on, reporting and recordkeeping violations of the Slaughterhouse SPDES Permit, are thoroughly intertwined with the other violations that were mooted. When claims "involve a common core of facts" or are "based on related legal theories … making it difficult to divide the hours expended on a claim-by-claim basis, the Court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Fox*, 129 S.Ct. at 670 (quoting *Hensley*, 461 U.S. at 435). HSUS attempted to segregate out fees associated with the moot violations, but with only limited success.

Based on the "significance of the overall relief obtained" in relation to the hours expended, a further reduction is in fact necessary. While HSUS maintains that the result was "excellent," *see Fox*, 129 F. Supp. 2d at 673 (where plaintiff "has obtained excellent result" the fee award should not be reduced further), I believe the success compared to what was initially sought was at best "partial or limited." *See Hensley*, 461 U.S. at 436. In addition to declaratory and injunctive relief, Plaintiff sought a massive amount of civil penalties, based on major discharge violations of both sets of permits. In contrast to what was originally sought, this Court sustained only the reporting and recordkeeping violations of one permit while all of the discharge

violations were deemed moot, and it resulted in no civil penalties levied against Defendant. *Cf. McDow*, 657 F. Supp. 2d at 470 ("it is difficult to conclude that plaintiff achieved anything close to what was sought"). As such, this Court finds that a further reduction of 25% is warranted, which is generally in accord with other cases where a plaintiff has had partial success. *See, e.g., McDow*, 657 F. Supp. 2d at 470 (12% reduction); *Hardaway*, 2010 WL 1541191 at *5 (25% reduction); *see also Adorno*, 685 F. Supp. 2d at 512 (60% reduction). This reduces the fee award to $444,135.13. HSUS receives a little less than 40% of the amount it claims was actually expended, and 68% of the amount it requested after initial voluntary reductions. Given the fact that it prevailed based on violations of one out of two permits, this seems reasonable and fair.

HVFG argues that virtually all of the fees are excessive, but it should be noted that the onus for this relatively expensive litigation falls equally, if not squarely, on Defendant itself. As noted in the summary judgment Opinion & Order, many of the reporting and recordkeeping violations were relatively obvious on their face; the plain language of the permit was sufficient in a number of cases to alert HVFG that they were in violation of the CWA. Defendants, however, insisted to the very end that these did not even qualify as CWA violations, despite regulations, case law, and the permit itself stating the contrary.

**C. Costs & Expenses**

Fee awards also include "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *Fox*, 129 F. Supp. 2d at 675 (quoting *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998)). Here, HSUS initially claimed $137,735.77 in costs and expenses, and slightly reduced the amount to $131,141.15 upon the Court's request for further itemization.[8] Generally speaking, the costs and expenses are itemized and appear reasonable. Given the length and technical requirements of this suit, the amount expended does not appear unreasonable. Only one expert witness was hired, and his fees account for around 10% of the overall costs for the litigation, which is not unreasonable given the nature of the suit. *Compare Adorno*, 685 F. Supp. 2d at 518 (40% of litigation costs spent on a single expert is money "not well spent"). HVFG challenges the expenses primarily on the basis of the degree of success obtained. For the reasons stated above, a reduction of 25% for Plaintiff's partial success is likewise appropriate for the costs sought. *See Fox*, 129 F. Supp. 2d at 672 (awarding no costs

[8] This figure includes both expenses and expert witness fees.

for certain claims due to lack of success). This brings the costs that awarded to Plaintiff to $98,355.86.

## III. CONCLUSION

For the reasons described above, Plaintiff is a prevailing party for purposes of attorney's fees and costs. The reasonable fees and costs, based on appropriate reductions, amount to $542,490.99.

**SO ORDERED**
**August 19, 2010**
**New York, New York**

**Hon. Harold Baer, Jr.**
**U.S.D.J.**